UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR 10-30005-RAL |
| | * | |
| Plaintiff, | * | FINDINGS OF FACT, |
| | * | CONCLUSIONS OF LAW, |
| vs. | * | OPINION AND ORDER |
| | * | GRANTING AMENDED |
| THOMAS M. WHITE | * | PETITION TO REVOKE |
| a/k/a Tommy White, | * | CONDITIONAL RELEASE |
| | * | AND DENYING § 4246(d) |
| Defendant. | * | DETENTION |
| | * | |

## I. Introduction

This Court has conducted a number of hearings in this case, including an evidentiary hearing

on April 8, 2013, and a hearing on April 30, 2013, on the Government's request that Defendant

Thomas M. White a/k/a Tommy White ("White") be detained under 18 U.S.C. § 4246. Section

4246 provides:

> If, after the hearing, the court finds by clear and convincing evidence
> that the person is presently suffering from a mental disease or defect
> as a result of which his release would create a substantial risk of
> bodily injury to another person or serious damage to property of
> another, the court shall commit the person to the custody of the
> Attorney General.

18 U.S.C. § 4246(d). This Court has pending before it as well a Motion for Revocation of

Conditional Discharge under 18 U.S.C. § 4246(f), Doc. 54, and an Amended Petition to Revoke

Conditional Release, Doc. 56.

White's case is a difficult one for application of § 4246. White's "mental disease or defect"

puts him at increased risk of behaving unlawfully. For the reasons explained below, the

Government has not met its burden "by clear and convincing evidence" to show that White's release

under conditions previously recommended by a health panel "would create a substantial risk of bodily injury to another person or serious damage to property of another," and thus will not detain White under § 4246(d). However, the Government has met its burden to prove that conditional release under the terms this Court previously set should be revoked. In anticipation of further proceedings in this case and to provide a full explanation of this decision, this Court sets forth its decision through Findings of Fact, Conclusions of Law, Opinion and Order.

## II. Findings of Fact

White was indicted on January 12, 2010, on a charge of robbery. Doc. 1. The indictment charged White as follows:

> On or about the 15th day of December, 2009, in Todd County, in Indian country, in the District of South Dakota, Thomas M. White, a/k/a Tommy White, an Indian, did by force, violence and by intimidation, take and attempt to take from the person and presence of Joshua First, a thing of value, that is, cash money, in violation of 18 U.S.C. §§ 1153 and 2111.

Doc. 1.

At the evidentiary hearing recently conducted, the Government put on evidence concerning White's behavior on December 15, 2009. At around 12:45 p.m., on December 15, 2009, Sergeant Edwin Young of the Rosebud Sioux Tribe Police Department was on patrol in St. Francis, Todd County, South Dakota. Sergeant Young saw a young man dressed in blue with a dark blue bandana around his neck. Sergeant Young later determined this individual to be White. Sergeant Young saw White throw up his arms at a van and then toward Sergeant Young's patrol car. White then kneeled down behind some bushes, after which he approached the patrol car and asked Sergeant Young if he had a problem. White then began yelling about the police being corrupt and needing to be shut

down. White's rant included profanities and concluded with a statement as White was walking away that the police needed to die. Sergeant Young lost sight of White and did not seek to arrest White for any of that behavior.

About half an hour later, at 1:19 p.m., on December 15, 2009, Sergeant Young was dispatched to the St. Francis Mission on a report of a male having pulled a gun at the Mission. The description of the male suspect matched that of White. Sergeant Young began looking for White, found White in an alley within walking distance of the St. Francis Mission, encountered White, told White to stop, drew his service revolver as White refused to stop, and instructed White to get down. White instead took off running through yards, and then north on the street where Sergeant Young had previously encountered White. White then fled into the canyon area outside of St. Francis. Sergeant Young pursued White and eventually saw White at a distance coming out of the canyon area. Sergeant Young and another officer who had been called as backup ultimately located White at a home, and the other officer arrested White.

The incident on December 15, 2009, at the St. Francis Mission was captured on videotape. On that day, Joshua First was working as a janitor at the St. Francis Mission. First saw White peek into the building and then knock on the door. First opened the door and came partially out of the doorway to talk to White. White was somewhat agitated, walking back and forth as he talked with First. White initially asked First for money, and First responded that he did not have any money. White then asked for First's cell phone, and First responded that White could use the cell phone at the administration building. White then raised his right hand with a handgun in his hand and pointed the gun at First's head. The videotape shows White doing this on two quick occasions and leaving. First recalls the gun clicking once when White initially raised it to First's head. First

3

recalls White pulling the trigger twice and the gun clicking twice when White raised the gun to First's head a second time. White then walked away, and First observed White knocking on a door and trying to get into a couple of trailer homes nearby. First called his supervisor and then 911 to report the incident. First did not find White to be threatening until White, without warning, put the apparently unloaded gun up to First's head and pulled the trigger.

After White was indicted in January of 2010, White's attorney filed a Motion for Competency Hearing, Doc. 30, representing that White had been evaluated by Dr. Stephen Manlove of Manlove Psychiatric Group and that Dr. Manlove found White to be suffering from a mental disease or defect rendering him incompetent to the extent that White was unable to understand the nature and consequences of the proceeding against him and unable to assist properly in the defense. The Government then filed a Motion for Court Ordered Psychiatric Exam. Doc. 31. This Court granted the Government's motion and directed that White be committed to the custody of the Attorney General for placement in a suitable facility for a period not to exceed 45 days for the purpose of conducting psychiatric or psychological examinations to determine whether White presently suffered from a mental disease or defect rendering him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceeding against him or properly assist in the defense and further to evaluate whether White was insane at the time of the offense charged. Doc. 32.

After granting several requested extensions, this Court received a competency evaluation done at the behest of the Attorney General. On August 30, 2010, this Court conducted a hearing on White's Motion for Competency Hearing after which this Court ruled:

The Court has considered two separate competency evaluations, one at Defendant's behest and one done by the Government. Pursuant to 18 U.S.C. § 4241(d), the Court finds by a preponderance of the evidence that Defendant is presently suffering from a mental defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Both competency evaluations reached this same conclusion due to Defendant's schizophrenia. Therefore, it is

ORDERED that Defendant is committed to the custody of the Attorney General, who shall hospitalize Defendant for treatment in a suitable facility for up to four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward. It is further

ORDERED that the parties notify the Court whether Defendant becomes competent to stand trial within those four months or, if not, another hearing be set regarding Defendant's competence within those four months. It is further

ORDERED that Defendant's Motion For Competency Hearing (Doc. 30) is granted to the extent set forth in this order and that Defendant may file a second Motion for Competency Hearing when he next wants the court to consider the issue. It is finally

ORDERED that Defendant's trial set for September 7, 2010, is continued until further order of this Court.

Doc. 38.

White ultimately underwent treatment and study at the United States Medical Center for Federal Prisoners in Springfield, Missouri, as a part of an effort to determine if White's competency could be restored and if he could become competent to stand trial. Psychologist Christina A. Pietz issued a report finding that White was not presently competent to stand trial and that the conditions from which White suffered—a cognitive disorder and borderline intellectual functioning—were unlikely to improve in the future. Doc. 48. The Government had filed a Motion for Determination of Mental Competency to Stand Trial, Doc. 45, and this Court held a hearing on that motion on April 5, 2011. At the hearing, the Government's counsel and White's counsel agreed with the

findings of Ms. Pietz. This Court thus determined that White suffered from a mental disease or defect rendering him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceedings against him and incapable of assisting properly in his defense. Doc. 48. This Court also determined that White's mental condition had not so improved as to permit the trial to proceed and further that there was no probability that White would regain competence to stand trial in the foreseeable future. Doc. 48. This Court then committed White for a period not to exceed 45 days to the United States Medical Center for Federal Prisoners in Springfield, Missouri, for further study regarding his dangerousness. Specifically, this Court

> ORDERED that if the director of the facility where Defendant is hospitalized certifies that Defendant suffers from a mental disease or defect as a result of which his release would create substantial risk of bodily injury to another person or serious damage to property of another and that suitable arrangements for state custody and care are not available, that certificate shall be filed both in the district where Defendant is hospitalized and in the District of South Dakota. It is finally
> ORDERED that upon completion of this period, unless otherwise ordered by the Court, Defendant is to be returned to this Court, either for disposition of the charges pending herein or for the determination, pursuant to 18 U.S.C. § 4246(d), of whether Defendant comes within the provisions of § 4246 and, if so, the consequences.

Doc. 48.

A three-person risk assessment panel conducted a study of White at the United States Medical Center for Federal Prisoners in Springfield, Missouri. See Def. Ex. C. After interviewing White, reviewing his medical records, observing him and considering reports by various doctors, the risk assessment panel concluded that White's release would not create a substantial risk of bodily injury to another person or serious damage to the property of another. Def. Ex. C. at 6-7.

Although the panel was "comfortable with [White's] release," it strongly recommended that White be required to attend a substance abuse treatment program, reside with a family member, seek Social Security Disability benefits, and have a designated payee. Def. Ex. C at 7.

On July 5, 2011, this Court held a hearing and heard sworn testimony from Stephanie Bordeaux, White's mother. Ms. Bordeaux testified that White could reside in her home and that she and her family would ensure that White follow any orders imposed by this Court. Both the Government and defense counsel agreed that White should be conditionally released under § 4246(e) upon certain conditions and once tribal court charges related to the same conduct were resolved, which has since taken place. Section 4246(e) allows a court to conditionally release a defendant if the court finds by a preponderance of the evidence that the defendant has recovered from his mental disease or defect to such an extent that "his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would no longer create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(e)(2).

The language of § 4246(e) seems to presuppose both that the defendant previously has been deemed "a substantial risk of bodily injury to another person or serious damage to property of another" under § 4246(d) and that the defendant "has recovered from his mental disease or defect to such an extent that his release would no longer create a substantial risk." 18 U.S.C. § 4246(e) and (e)(1). Because of a gap in the statutes into which White falls, the Government, White, and this Court all agreed to § 4246(e) being the vehicle to release White despite there having been no finding that he had been sufficiently dangerous to detain under § 4246(d) or that he had recovered from a mental disease or defect.

The testimony given at the July 5, 2011 hearing and the risk assessment panel's report supported by a preponderance of the evidence a finding that White qualified for conditional release upon specific conditions. This Court released White on conditions that included the following:

> ORDERED that while on conditional release, Defendant shall not commit another federal, state, local, or tribal crime; shall not illegally possess a controlled substance nor possess a firearm, destructive device, or other dangerous weapon; and shall comply with the following special conditions:

>> 1. Defendant shall not consume any alcoholic beverages or intoxicants. Furthermore, Defendant shall not frequent establishments whose primary business is the sale of alcoholic beverages.
>> 2. Defendant shall participate in a program approved by and at the direction of the probation office for the treatment of substance abuse.
>> 3. Defendant shall submit a sample of his blood, breath, or urine at the discretion or upon the request of the probation office.
>> 4. Defendant shall undergo inpatient/outpatient psychiatric or psychological treatment, as directed by the probation office.
>> 5. Defendant shall take any and all medications prescribed by his treating mental health care professional.
>> 6. Defendant shall apply for Social Security Disability with a designated payee.
>> 7. Defendant shall reside with Stephanie Bordeaux until further order of this Court. While residing there, Defendant shall be under the strict supervision of either Stephanie Bordeaux or another family member.
>> 8. Defendant shall not have any personal or third-party contact, correspondence, or communication with known gang members, nor display clothing or any new insignias that would reflect gang affiliation
>> . . .

It is further

ORDERED that upon receipt by the Court of credible evidence that Defendant has not complied with the conditions set forth herein, the Court will order the arrest of Defendant and his return to the Court for a hearing to determine if the conditional release should be revoked in accordance with the law.

Doc. 51.

Sandy McKee was the officer from the United States Probation and Pretrial Services Office that supervised White during his conditional release. McKee administered nine separate urinalysis tests. White tested "hot" for marijuana use on two occasions—in October of 2011 and April of 2012. However, the THC nanogram levels recorded in those two tests were quite low and White's urine samples were negative on the seven other occasions. White did not display behavioral problems towards McKee, although he was becoming agitated at the time of the April 2012 test and asked during one of the tests whether McKee could pour out the urine sample and "call it even." McKee dealt primarily with White's mother, Stephanie Bordeaux, in supervising White and encountered White's father, John White, very intoxicated on one of her visits to the home of White's parents. McKee could not find White at his parents' home from January until March of 2012. McKee initially was told by Ms. Bordeaux that White was playing basketball in Winner during that time, but ultimately learned from Ms. Bordeaux that White in fact had been living in Winner with his sister Lisa Long Crow. White then returned to live at his parents' home, so no petition to revoke the conditional release was filed until an incident involving White in June of 2012.

On June 6, 2012, about eleven months after White had been conditionally released, White was living at his parents' residence in St. Francis as he had been ordered to do. See Doc. 51 at 3. That day, White confronted Thomas Covey in the backyard of Covey's home in St. Francis. White

9

approached Covey, raised his right hand while holding an iron bar in a menacing manner, and asked Covey where Covey's son T.J. was. Covey responded that T.J. might be out front of the house (although T.J. at the time was in Mission, South Dakota). White walked away, but hollered back that he had a type of an assault weapon. Lewis Rabbit, Sr., who was with Thomas Covey at the time, witnessed and heard these events as well.

After confronting Thomas Covey in the backyard, White then walked to the front of the Covey home and encountered Thomas Covey's 21-year-old-son, Harley Covey ("Harley"). Harley was sitting in the driver's seat of his mother's truck with the driver's side door open. Harley had seen White raise the bar at his father, watched White walk towards him, and witnessed White cock the bar at him. Harley flinched, White did not strike Harley, and White asked where T.J. was. Harley responded that T.J. was not there, and White walked off. Harley heard White say that he had an assault rifle and that he had been in prison due to the Coveys. In reality, the Coveys had nothing to do with the reasons White had been in prison, although there was some history of T.J. Covey and White "getting into it," as Thomas Covey put it.

Thomas Covey's wife then called 911 about White having threatened people with an iron bar. Rosebud Sioux Tribe police officer Ian Little Shield responded to the call and approached White outside White's parents' home. Officer Little Shield was wearing a body camera and microphone that created a videotape of the incident. White's parents—John White and Stephanie Bordeaux—were present with White outside the home. Officer Little Shield told them that he had received a call about White threatening someone with a bar, that White had an active Rosebud Sioux Tribe warrant for an older driving under the influence ("DUI") offense, and that he needed to arrest White. White's mother and father told Officer Little Shield repeatedly that the warrant was taken

care of and was not valid. White joined in by repeating some of what his parents were saying. White's demeanor became increasingly uneasy as the conversation progressed, and Officer Little Shield deployed OC spray on White's face as White took off running. Officer Little Shield pursued White on foot and called for backup. When Officer Little Shield found White hiding behind a van, Officer Little Shield deployed more OC spray to White's forehead and eyes, and White swung his right fist and hit Officer Little Shield on the left side of his head. White's mother Stephanie Bordeaux tried to intervene, to calm White down, and to instruct White to stop running. White continued running and at another time hit Officer Little Shield in the arm. Officer Little Shield ultimately apprehended White and took White into custody.

At the Rosebud Sioux Tribe Police Department on the next day, June 7, 2012, Special Agent Benjamin Estes attempted to interview White. Despite White repeatedly invoking the Fifth Amendment, Special Agent Estes gave White his Miranda warning and proceeded to ask questions of White. White's statements during this interview would be subject to suppression if sought to be introduced against White at a trial, but are considered here not as to White's guilt or innocence. White—as seems to be the case throughout—responded to Special Agent Estes at times in a way that would suggest that he understood questions and at other times responded nonsensically. White's substantive statements are noteworthy only to the extent that, at one point, White said that he may have forgotten to take his medication and that he had no recollection of what had occurred around the time of his arrest.

The Government introduced evidence about White's entire criminal history. White's date of birth is July 6, 1987, making him 25 years of age presently. Other than the offenses described above, White was arrested twice on DUI charges by then-Rosebud Sioux Tribe police officer

Anthony Long Soldier. On April 26, 2008, at 5:23 a.m., Officer Long Soldier received a call about a man who had been drunk and disorderly at or near the Mervin Hairy Shirt residence and was in a vehicle. At 5:53 a.m., Officer Long Soldier found the suspect vehicle pulling into the Stephanie Bordeaux home. A male, who turned out to be White, got out of the driver's seat and ran away, hollering "I'm here" as he ran. Officer Long Soldier instructed White to stop, but White fled and disappeared from Officer Long Soldier into the darkness. A short time later, White came out of some bushes toward Officer Long Soldier. Officer Long Soldier repeatedly commanded White to show his hands and get on the ground, but White did not follow the instructions. Officer Long Soldier drew his OC spray and used it on White. White was uncooperative as Officer Long Soldier handcuffed him, and White screamed profanities and yelled for his mother. White's mother Stephanie Bordeaux came out and told her son to behave and provided some water to help wash the OC spray from his eyes and face. White was intoxicated at the time.

On September 18, 2008, Officer Long Soldier encountered White shortly after 11:00 p.m., after stopping White's vehicle for rolling through a stop sign in Mission, South Dakota. White smelled of alcohol and marijuana. Officer Long Soldier called for a canine unit, and the drug dog alerted to the vehicle. White was intoxicated, less than completely compliant, and, in Officer Long Soldier's perception, seemed like he wanted to run. At one point, White hollered for the other occupant of his vehicle to "run for it."

The Government called Calvin Waln, Jr. as a witness as well. Waln currently is a Rosebud Sioux Tribe Council member, but previously was employed with the Rosebud Sioux Tribe Police Department from 1999 through June of 2012. Waln is a member of the Rosebud Sioux Tribe and very knowledgeable about criminal activity that occurred on the Rosebud Indian Reservation during

his time with the Rosebud Sioux Tribe Police Department. Waln encountered White following the December 15, 2009 incident at the St. Francis Mission where White pulled a gun on Joshua First. In Waln's patrol car, White was less than cooperative and said something to the effect that Waln was "on lockdown and was going to be shut down." Waln knew White previously and described White as having behaved that evening like White does. Waln testified that White is not fond of law enforcement and tends to run from law enforcement. In addition to White's two prior DUIs, Waln had heard of an incident where White resisted an arrest by Officer Frank Iron Heart, possibly during 2007, a year in which a computer snafu resulted in the loss of much of the Rosebud Sioux Tribe police records from that time; neither counsel were aware of any such incident and Waln's testimony was hearsay in nature. Waln viewed White as someone whom law enforcement had to regard with caution, but not among the more dangerous residents of the Rosebud Sioux Indian Reservation.

Following White's arrest on June 6, 2012, the Government filed a Motion for Revocation of Conditional Discharge, Doc. 54. Separately, an Amended Petition to Revoke Conditional Release, Doc. 56, likewise was filed, based primarily on the events of June 6, 2012. Doc. 56. On August 2, 2012, this Court entered an Order directing White's commitment to the custody of the Attorney General for further psychiatric or psychological examination and study of White under 18 U.S.C. § 4246. Among other things, this Court:

> ORDERED that the Defendant remain at the designated facility for up to 45 days to determine if (a) he is presently suffering from a mental disease or defect and (b) whether his release would create a substantial risk of bodily injury to another person, or serious damage to property of another, and (c) any other appropriate determinations as envisioned by 18 U.S.C. § 4246.

Doc. 64. This Court conducted several status hearings in the case and granted a request by White's counsel to have him evaluated anew by Dr. Stephen Manlove.

White again went for study to the United States Medical Center for Federal Prisoners in Springfield, Missouri, where a panel convened at a time when Dr. Christina Pietz was present. The panel produced a risk assessment review report. Doc. 66. Among other things, the report noted that White was cooperative and polite with staff and had not engaged in assaultive conduct towards staff or other inmates. Doc. 66 at 8. White functioned in an open unit with no difficulties, much as he had done in his previous visits, and was allowed to move freely throughout the institution, eating his meals in the main dining hall, and spending much of his free time interacting with others. Doc. 66 at 6-8. White maintained good hygiene, took care of his personal appearance, and did not engage in bizarre behavior. Doc. 66 at 8. However, White continued to struggle to express himself and at times spoke in an incomprehensible manner. Doc. 66 at 8. While the etiology of White's mental health problems remain unclear, White's ultimate diagnosis was cognitive disorder not otherwise specified and borderline intellectual functioning. Doc. 66 at 9.

The risk assessment panel recognized that it was charged with determining "if (1) Mr. White is presently suffering from a mental disease or defect, (2) would his release create a substantial risk of bodily injury to another person or serious damage to property of another, and (3) would that risk be due to a mental illness?" Doc. 66 at 9; see also Doc. 64. The panel's report observed that "White's cognitive limitations negatively impact his decision making. More importantly, these limitations are exacerbated when he consumes illicit substances and alcohol . . . . Mr. White's anger is intensified when he consumes illicit substances and alcohol." Doc. 66 at 9. Ultimately, the risk assessment panel's report did not directly answer the key question here: whether White's "release

14

would create a substantial risk of bodily injury to another person or serious damage to property of another." See 18 U.S.C. § 4246(a) and (d). The report concluded:

> In summary, it is the opinion of the Panel members that Mr. White meets the diagnostic criteria for Cognitive Disorder NOS, Borderline Intellectual Functioning, Cannabis Abuse and Alcohol Abuse. It is doubtful that either of these conditions will substantially change even if he agreed to participate in mental health treatment. The Panel opined that his mental illnesses place him at increased risk for violent behavior. Consequently, given the information available about Mr. Wh ite, and based on these considerations, the Risk Assessment Panel recommends he be committed for care and custody in a suitable facility for the treatment of a mental disorder pursuant to Title 18, U.S. Code, Section 4246(a) to prevent potential harm to others or serious property damage.

Doc. 66 at 10. Despite the panel report stopping just short of finding White's release to create a "substantial risk of bodily injury to another person or serious damage to property of another," 18 U.S.C. § 4246(d), the warden issued a Certificate of Mental Disease or Defect and Dangerousness, Exhibit 4. The Government did not call as a witness any mental health professional at the evidentiary hearing.

White called Dr. Manlove to testify. Dr. Manlove confirmed that White suffers from a mental disease or defect that is not likely to improve and that White is not capable of understanding charges against him or assisting in the defense of those charges. Dr. Manlove further agreed with the diagnosis of White hav ing a cognitive disorder not otherwise specified and borderline intellectual functioning, but Dr. Manlove added to White's diagnosis that he suffers from a "Psychotic Disorder" not otherwise specified. Def. Ex. A at 5. Dr. Manlove further agreed that White is "at increased risk for engaging in criminal/violent behavior at some point in the future." Def. Ex. A at 5. However, Dr. Manlove concluded that White is not "acutely dangerous or

imminently dangerous to himself or others." Def. Ex. A at 6. Dr. Manlove noted that many mentally ill individuals are at increased risk of dangerousness to the community at some point, Def. Ex. A at 6, but Dr. Manlove took the question to be whether White was a "substantial risk" to harm others. Based on his evaluation of White, Dr. Manlove testified that White has no suicidal thoughts or attempts, no homicidal thoughts or attempts, no desire to hurt anyone or threats thereof, no significant anti-social personality, and no history of violent behavior or threats at any facility. Def. Ex. A at 4-6. Dr. Manlove recommended a structured, out-patient setting for White. Def. Ex. A at 6. White likewise has been seen by Dr. Daniel V. Foster, a clinical psychologist. This Court received into evidence by stipulation of counsel a competency evaluation where Dr. Foster opined that "White has the capacity to respond well in a structured, therapeutic environment," although White prefers to be at home. Def. Ex. 7.

At the evidentiary hearing, White's father, John White, testified. John White lives with Stephanie Bordeaux, White's mother. John White confirmed that White in fact had been staying in Winner with his sister Lisa Long Crow during early 2012, inconsistent with the terms this Court set for conditional release. See Doc. 51 at 3. John White expressed his anger towards the Rosebud Sioux Tribe police and blamed the police for wrongfully arresting his boys when gang members wearing red confronted his boys. John White believed that White's mental functioning had improved and regularly had trusted White to babysit a grandchild who lived at the home. Despite his son's prior DUI arrests, John White denied that his son had alcohol or marijuana issues, and was unaware of what medications were prescribed to his son. John White initially denied but later acknowledged that his son sometimes has psychotic issues. John White expressed a desire that his son get out of custody but not return to St. Francis this time.

## III. Conclusions of Law and Opinion

### A. Revocation of Conditional Release

A district court may revoke conditional release under § 4246(f) if (1) the person failed to "comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment" and (2) the person's "continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(f); see also United States v. Woods, 970 F.Supp. 711, 714 (D. Minn. 1997) (listing the two conditions). The statute is silent as to the Government's burden of proof on these two elements, but courts addressing this issue require a showing of both elements by a preponderance of the evidence. See Woods, 970 F.Supp. at 717-18; Sealed Appellee v. Sealed Appellant, 665 F.3d 620, 623 (5th Cir. 2011) (holding that the preponderance of the evidence standard applies to both elements necessary to revoke conditional discharge).

Implicit in the first element of compliance "with the prescribed regimen of medical, psychiatric, or psychological care or treatment" is compliance with the conditions set by a court to assure compliance with a proper mental health regimen. White's cognitive issues were such that this Court required White to reside with his mother Stephanie Bordeaux and required White to avoid substance abuse as part of his mental health regimen, both of which conditions White violated. Here, the evidence establishes well beyond a mere preponderance of the evidence that White failed to comply with the terms of his conditional release through the following conduct: (1) not residing with Stephanie Bordeaux during at least parts of January, February, and March of 2012; (2) two positive urine tests demonstrating use of marijuana; (3) threatening Thomas Covey and then Harley Covey by brandishing a metal bar in a menacing manner on June 6, 2012; and (4) resisting the arrest

17

by Officer Ian Little Shield on June 6, 2012, including striking Officer Little Shield in the head and shoulder while resisting arrest. Thus, the Government has established by a preponderance of the evidence the first element required to conditionally revoke White—that White failed to "comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment." 18 U.S.C. § 4246(f).

Whether the second element required to conditionally revoke White—that White's continued release creates "substantial risk of bodily injury to another person or serious damage to property of another"—is a more difficult issue. 18 U.S.C. § 4246(f). White succeeded in having has behavior conform with law sufficient to avoid any arrest or encounter with law enforcement for eleven months of his conditional release. Yet these eleven months were not without issue. White passed most drug tests, but tested positive for marijuana twice, and Stephanie Bordeaux initially misled probation officer Sandy McKee to believe that White was playing basketball in Winner (rather than living in Winner). Stephanie Bordeaux later acknowledged to McKee that White in fact had been living in Winner with his sister during early 2012.

When Officer Little Shield came to arrest White on June 6, 2012, Stephanie Bordeaux and John White initially tried to talk Officer Little Shield out of doing so and argued about the authenticity of the tribal warrant, while White stood by becoming increasingly agitated. John White's antipathy toward tribal law enforcement likely is a contributing factor to White's history of resisting arrests and running from tribal officers. White also has an issue with at least T.J. Covey, whose family lives nearby in St. Francis. In short, the home of Stephanie Bordeaux in St. Francis is not an appropriate place to release White. The Government has shown that there exists a substantial risk of harm if White is released on the same terms, because neither White nor Stephanie

18

Bordeaux abided by necessary conditions of the conditional release. However, whether White cannot be released at all because he is a "substantial risk of bodily injury to another person or serious damage to property of another" is a more involved question to which the Court now turns.

## B. Commitment Under § 4246

This Court has to apply in White's case 18 U.S.C. §§ 4241 through 4246, even though those statutes are difficult to apply to a defendant with White's sort of mental health condition and characteristics. A defendant is subject to § 4246 once mental health professionals certify to the court that a defendant—as with White here—will not regain competence. United States v. Millard-Grasshorn, 603 F.3d 492, 493-95 (8th Cir. 2010). Section 4246(e) allows release of such a defendant whose recovery from the mental defect is such that he no longer poses a substantial risk of harm. White's condition is one from which there appears to be no recovery. Nevertheless, by agreement between the Government and White in July of 2011, this Court conditionally released White under § 4246(c). At that time, the Government's risk assessment panel had concluded that White's release under conditions would not create a substantial risk of harm and there had been no finding that White was a substantial risk of harm.

After the events of June 6, 2012, a certification exists that White poses a substantial risk of harm. Ex. 4. Under § 4246, a court must then conduct a hearing once the director of the hospital that is housing an incompetent defendant deemed not likely to regain competence files a certificate that a person is suffering from a mental disease such that his release poses a substantial risk of dangerousness. 18 U.S.C. § 4246(a) and (c); see also Woods, 970 F.Supp. at 713-15. A court can order that person civilly committed after a hearing only if the court finds by clear and convincing evidence that the release poses a "substantial risk of bodily injury to another person or serious

damage to the property of another." 18 U.S.C. § 4246 (a) and (d). If a court makes such a finding, that person is committed to hospitalization by the Attorney General until he can either be placed in his home state or until the hospital certifies that his condition has improved such that he can be released outright or with conditions. See 18 U.S.C. § 4246(d); United States v. Steil, 916 F.2d 485, 488 (8th Cir. 1990) ("[T]he Attorney General must continue to make all reasonable efforts to place Steil in a suitable state facility, see 18 U.S.C. § 4246(d), and to prepare annual reports concerning Steil's mental condition and the need for his continued hospitalization."); United States v. Duhon, 104 F.Supp.2d 663, 679 (W.D. La. 2000).

The Government requests that White be confined possibly until the end of the maximum penalty he faces for the underlying offense, under 18 U.S.C. § 4246. Under § 4246(d), the Government has a burden to prove by clear and convincing evidence three things: "(1) mental disease or defect; (2) dangerousness if released; and (3) no suitable state placement." United States v. Ecker, 30 F.3d 966, 970 (8th Cir. 1994). There is no question that White suffers from a "mental disease or defect." White does not contest that there is "no suitable state placement." The Certificate of Mental Disease or Defect and Dangerousness executed at the United States Medical Center for Federal Prisoner, Exhibit 4, states that the warden believes "that suitable arrangements for state custody and care over inmate White are not currently available." That leaves the sole issue being "dangerousness if released." See Ecker, 30 F.3d at 970.

The actual standard of "dangerousness if released" is contained in § 4246(d) and is expressed as:

> Clear and convincing evidence that the person is presently suffering
> from a mental disease or defect as a result of which his release would

create a substantial risk of bodily injury to another person or serious
damage to property of another . . . .

18 U.S.C. § 4246(d). "Section 4246 provides little guidance as to how the government must prove

that a person poses a substantial risk." United States v. Sahhar, 917 F.2d 1197, 1207 (9th Cir. 1990)

(noting that the term "'substantial . . . as used in federal commitment statutes, cannot be quantified'")

(internal quotation marks omitted). The standard "substantial risk" in § 4246(d) requires

"'something more serious than is demonstrated by idiosyncratic behavior,'" Sahhar, 917 F.2d

at 1207-08 (quoting Addington v. Texas, 441 U.S. 418, 427 (1979)), but does not require "[o]vert

acts of violence." Ecker, 30 F.3d at 970. The United States Court of Appeals for the Eighth Circuit

has observed that "dangerousness is certainly not an alien term to trial judges." Steil, 916 F.2d at

487 (quoting United States v. Cox, 719 F.2d 285, 287 (8th Cir. 1983)).

Whether the Government has carried its burden to establish by clear and convincing

evidence that White poses a "substantial risk" of bodily injury to others or destruction of another's

property is a close call. This Court starts by considering the expert opinions as to White's

dangerousness. See Ecker, 30 F.3d at 970. The Government's risk assessment panel in 2011

concluded that White did not impose such a substantial risk of dangerousness. After White's

conduct in June of 2012, following eleven months of conditional release, the Government panel

issued a report stating that White was at an "increased risk for violence" based on his "cognitive

limitations and use of illicit substances and alcohol" and that his "criminal history, significant

history of using illicit substances, and abuse of alcohol are all factors that increase his risk for

engaging in criminal behavior because of his cognitive limitations." Doc. 66 at 10. Dr. Manlove,

the defense expert, agreed that White's history puts him at some increased risk of dangerousness,

but Dr. Manlove opined that White was not a "substantial risk" because, among other reasons, White did not have any thoughts or desires to harm himself or others, had no significant anti-social personality, and did not exhibit aggressive behavior in any facility. Def. Ex. A at 6. Of the mental health professionals who treated and observed White, only Dr. Manlove testified at the evidentiary hearing. Both Dr. Manlove's report and the reports at various times from government psychiatrists and psychologists establish that, due to his mental condition, White is at an increased risk for engaging in criminal or violent behavior at some point in the future. See Def. Ex. A at 6; Def. Ex. C at 6-7; Gov't. Ex. 1 at 9. However, there is a difference between being an "increased risk" and being a "substantial risk."

In addition to considering expert testimony, the Eighth Circuit in Ecker suggested that, in determining whether a person constitutes a substantial risk of dangerousness, a court consider whether the person has "a history of dangerousness, a history of drug or alcohol use, identified potential targets, previous use of weapons, any recent incidents manifesting dangerousness, and a history of problems taking prescribed medicines." Ecker, 30 F.3d at 970. Application of the Ecker factors to White likewise are inconclusive as to whether the Government carried its burden. First, White has a history of intermittent dangerous behaviors mixed with periods during which he appears not to be dangerous. The incident with the gun at the St. Francis Mission in December of 2009 is the most serious and dangerous conduct in which White has engaged. Yet, even after that incident, the panel, on May 19, 2011, determined that White was not so dangerous that he ought not to be released. Def. Ex. C. That is, the panel concluded that White's release at that time after the St. Francis incident "would not create a substantial risk of bodily injury to another person or serious damage to property of another person." Def. Ex. C at 6-7. After White had been on conditional

release for eleven months and then had threatened people with a bar and assaulted an officer after being sprayed with OC spray on June 6, 2012, a similar government panel determined that White ought not to be conditionally released. Doc. 66; Ex. 4. White has a history and reputation of running from tribal police, but is not regarded as particularly dangerous in his community.

White has a history of drug and alcohol abuse. He had two DUI arrests in 2008, and he tested positive for low levels of marijuana on two of the nine tests administered while on conditional release. White has not identified potential targets nor made specific or even general threats against society. He appears to harbor some ill will to T.J. Covey and appears to share in his father John White's distrust of the police. However, White has never targeted any specific individual or group of individuals to injure.

White has used weapons in the past; he used a bar to threaten the Covey's and he used some sort of a gun during the St. Francis incident. The incident with the bar followed by the punching of the police officer are recent; these incidents are what gave rise to the latest incarceration. But, prior to those incidents, White had been out on release for nearly a year without violent incidents. White has exhibited no dangerous behavior in custody and has moved freely at institutions and functioned in an open unit with no difficulties during his incarceration. Doc. 66 at 9. White does not appear to require medications for his mental disease and, therefore, the factor inquiring as to whether the person has a history of not taking prescribed medicines does not support his continued commitment. Doc. 66 at 7.

White does not have the type of history signaling a threat of future dangerousness similar to many other defendants committed under § 4246. See United States v. Williams, 299 F.3d 673, 676-77 (8th Cir. 2002) (finding substantial dangerousness when prisoner had been arrested for

threatening a federal judge and other officials, prisoner still desired to harm the officials, prisoner possessed bomb making equipment and instructions, and his personality disorder caused him to act with "bizarre, defiant and explosive behavior"); Ecker, 30 F.3d at 970, n.7 (finding substantial dangerousness when prisoner had history of violence, had written threatening letters, had a history of drug abuse and weapons possession, and failed to take his prescribed medications); United States v. S.A., 129 F.3d 995, 1000 (8th Cir. 1997) (upholding commitment for prisoner with long history of aggressive and violent behavior, mental instability that causes hallucinations urging him to act violently, drug and alcohol abuse history, and who had made threats about future crimes). Indeed, an apparently much more dangerous prisoner was not committed in United States v. Chairse, 18 F.Supp.2d 1021 (D. Minn. 1998), where a district court found the Government had failed to prove a substantial risk such that he could not be released on his scheduled supervised release with conditions mitigating his dangerousness despite the prisoner's extensive criminal history, problems taking his prescribed medication, substance abuse problems, threatening behavior to prison medical personnel, and statements that he wanted to rip the heads off the risk assessment panel members and drink their blood. Id. at 1031-32.

Ultimately, the Government must prove by clear and convincing evidence that White's release "would create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(d). This case presents a close call, because White's conduct on December 15, 2009, and on June 6, 2012, did create a substantial risk of bodily injury to others. However, White, other than two DUIs in 2008 and these instances, apparently has not otherwise engaged in behavior risking bodily injury or property damage. He was able to live for eleven months on conditional release in a high crime area before engaging in conduct that was dangerous.

The risk panel has once found him not sufficiently dangerous to confine and later found him to be at an increased risk for dangerousness. A private psychiatrist believes that White is not of such a danger to merit confinement. With this being a close call, and the Government having the burden by "clear and convincing evidence," this Court concludes that the Government has not sustained its burden to show sufficient dangerousness to merit indefinite confinement of White under § 4246.

Section 4246 does not make clear what to do with those persons found to be incompetent and not likely to regain competence, but not found to "pose a substantial risk of bodily injury to another person or serious damage to the property of another." See 18 U.S.C. § 4246; United States v. Shawar, 865 F.2d 856, 863 (7th Cir. 1989) ("Admittedly, it is not entirely clear what should happen after the initial commitment period to the non-dangerous individual who will never regain competency."); United States v. Wheeler, 744 F.Supp. 633, 637 (E.D. Pa. 1990)("[S]ection 4246 establishes procedures to follow only with respect to those defendants whose release would create a substantial risk of danger to society."). Courts generally conclude that custody with the Attorney General is not appropriate for defendants deemed incompetent, but not dangerous. See Duhon, 104 F.Supp.2d at 681 ("Where, as here, the court finds that the defendant's mental condition has not so improved so as to permit the trial to proceed and that the defendant's release would not create a substantial risk of bodily injury to another person or serious damage to the property of another, the dictates of due process do not allow additional commitment to the Attorney General's custody. Care for the mentally incompetent, where necessary, has historically been left to the states."); Wheeler, 744 F.Supp. at 639-40 ("If I determine that defendant's mental condition has *not* so improved as to permit the trial to proceed and that defendant's release would *not* create a substantial risk of bodily

injury to another person or serious damage to property of another, I have no statutory authority to commit defendant to the custody of the Attorney General.") (emphasis in original).

In this case, the Government has made a showing meriting revocation of conditional release and even White's own psychiatrist views him as an "increased risk" of dangerousness. White's violation of the terms of conditional release when released to Stephanie Bordeaux in St. Francis and other problems with that arrangement require that some alternative conditional release terms need to be fashioned. Section 4246(e) provides that "[t]he Court at any time may, after a hearing . . . , modify or eliminate the regimen of medical, psychiatric, or psychological care or treatment." Again, application of § 4246 to White's condition and case is awkward, but the condition to "reside with a family member" derives from the 2011 panel report, Def. Ex. C at 7, and is a necessary part of White's mental health regimen given his cognitive issues. This Court may consider release to Lisa Long Crow, a sister of White, but wishes to hear testimony from her first. At this time, White shall remain in the custody of the United States Marshal, as any release of White will have to be on conditions similar to those previously set, but to some location other than St. Francis, South Dakota.

## IV. Order

For the reasons explained above, it is hereby

ORDERED that the Government's Motion for Revocation of Conditional Discharge, Doc. 54, is granted. It is further

ORDERED that the Amended Petition to Revoke Conditional Release, Doc. 56, is granted. It is further

ORDERED that the request of the Government for indefinite confinement under 18 U.S.C. § 4246 is denied. It is finally

26

ORDERED that Thomas M. White a/k/a Tommy White is remanded to the custody of the United States Marshal to be held pending arrangements for different conditional release.

Dated May 28th, 2013.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE